IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION

|  |  |  |
|---|---|---|
| VANCE GOOD, | * | |
| | * | 1:09-cv-28 RP-RAW |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | * | |
| | * | MEMORANDUM OPINION |
| | * | AND ORDER |
| Defendant. | * | |
| | * | |

  Plaintiff, Vance Good, filed a Complaint in this Court on August 20, 2009, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. and 1381 *et seq*. This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

  Plaintiff filed his applications for benefits on February 13, 2002. Tr. at 110-12 & 423-26. Plaintiff, whose date of birth is May 30, 1971 (Tr. at 110), was nearly 33 years old at the time of a hearing on March 12, 2004. Tr. at 450-75. Administrative Law Judge Peter Belli issued a Notice of Decision – Unfavorable on February 9, 2005. Tr. at 53-64. The ALJ found that Plaintiff's learning disorder and depressive disorder are considered severe impairments, but not severe enough to prevent him from working absent a substance addiction disorder. The ALJ found that Plaintiff is able to perform his past relevant work as a welder helper, a truck washer, or a security guard. Tr. at 63-64.

  On January 16, 2007, the Appeals Council issued a Notice of Order of Appeals Council Remanding Case to Administrative Law Judge. Tr. at 97-101. The Appeals Council found that the ALJ did not adequately consider the assessment of psychologist Mary Ann Strider, Ph.D.

The Appeals Council also found that the ALJ did not adequately determine Plaintiff's mental residual functional capacity.  Finally, the Appeals Council noted that earnings were credited to Plaintiff's account which the ALJ was not aware of when he found Plaintiff had not engaged in substantial gainful activity after the alleged onset of disability.  Tr. at 99.

On remand, the case was assigned to Administrative Law Judge Thomas M. Donahue. Hereafter, Judge Donahue will be referred to as the ALJ.  Plaintiff appeared for a hearing on August 23, 2007.  Tr. at 476-96.  The ALJ issued a Notice Of Decision – Unfavorable on March 14, 2008.  Tr. at 16-29.  The Appeals Council declined to review the ALJ's decision on July 15, 2009.  Tr. at 7-11.  Thereafter, Plaintiff commenced this action.

In his decision, the ALJ found that Plaintiff meets the insured status of the Social Security Act until March 31, 2011.  He found that Plaintiff had not engaged in substantial gainful activity since his amended onset date of disability, November 19, 2001.  The ALJ found Plaintiff has the following severe impairments: borderline intellectual functioning with a learning disability for reading; depressive disorder, NOS[1]; impulse control disorder; intermittent explosive disorder; inadequate, passive and/or dependent personality features and a history of polysubstance abuse in recovery.  Tr. at 22.  The ALJ found that these impairments, alone or in combination, do not qualify Plaintiff for benefits at the third step of the sequential evaluation.  At the fourth step, the ALJ found Plaintiff has the residual functional capacity to perform work at all exertional levels, but that work needs to be low stress, quantified at a 4 on a scale of 1-10 – less than complex, but more than simple, routine, repetitive tasks.  Tr. at 23. The ALJ stopped the sequential evaluation at the fourth step, finding that Plaintiff is able to perform his past

---

1. Not otherwise specified.

relevant work as a can sorter and stock clerk. Tr. at 28. The ALJ also noted the existence of other jobs in the national economy which Plaintiff could perform if the sequential evaluation had proceeded to the fifth and final step. The ALJ held that Plaintiff was not disabled nor entitled to the benefits for which he had applied. Tr. at 29.

## MEDICAL & VOCATIONAL EVIDENCE

X-rays of Plaintiff's right hand dated June 12, 2001, showed a comminuted fracture through the neck of the fifth metacarpal. Tr. at 248.

On April 1, 2002, Plaintiff underwent a psychological evaluation by Mary Ann Strider, Ph.D. Tr. at 250-53. Plaintiff reported a history of being involved in a car accident, as a passenger, in 1992. Plaintiff reported that he was not using alcohol. When discussing his family history, Plaintiff said that his father was abusive to both him and his mother. He said that his father once shot at him. Plaintiff said that although he finished high school, he thought his skills were at a sixth grade level. He said told the psychologist that when he tried to read he would see things backwards and letters would move around. Plaintiff said that he could not obtain a driver's license because of his inability to read and that his inability to read made it impossible for him to work as a cook because he can not read orders. Plaintiff told the psychologist that he has problems on the left side of his body: "my left side locks up on me. It will turn purple with white bumps. Sometimes the pain takes me to the floor and I'm sweating really bad." Tr. at 250. On mental status exam, Plaintiff admitted to crying spells, especially when alone. He also admitted to hearing voices which say "You're worthless, you're no good." Tr. at 251. On the WAIS-3 (Wechsler Adult Intelligence Scale - 3), Plaintiff scored a verbal IQ of 71, a performance IQ of 87, and a full scale IQ of 77. Plaintiff complained of an inability to

remember. On the Wechsler Memory Scale, his scores did not provide evidence of memory difficulties based on organic problems. Dr. Strider opined that his perception of memory difficulties are based on emotional and stress situational factors. Dr. Strider's Axis I diagnoses were: Major depression, moderate, with under stress psychotic features; learning disability, severe for reading; rule out posttraumatic stress disorder; rule out intermittent explosive disorder. Tr. at 252. Concluding her report, Dr. Strider wrote:

> This gentleman does need evaluation and treatment for depression. In light that he is willing to work, has shown skills when the situation does not rely on verbal and written processing, I would not see him as totally disabled. However, presently, I think between his pain and depressive features, he would have difficulty maintaining employment as the record supports. I would recommend that he get some assistance for treatment and possible help and referral from vocational rehabilitation for more appropriate aspects in the job force.

Tr. at 252-53.

A hospital record dated August 29, 2002, notes that Plaintiff was taking the medication Paxil. Plaintiff was being treated for a mass on the back of his neck which needed to be removed. Tr. at 282, 299.

On September 9, 2002, Plaintiff was seen by George L. Pratt, D.O., for an examination arranged by an Iowa Disability examiner. Tr. at 301-04. Plaintiff reported that as a result of the car accident in 1992, and the injury to his right hand, he has decreased grip strengths and occasional discomfort at the site of the injury. Plaintiff reported that four years before the examination, he had an episode of numbness of the entire left side of his body. A month before the exam, he had a second episode which lasted 45 minutes. He said he went to the emergency room and was diagnosed as "nerves." Tr. at 301. After a physical examination, Dr. Pratt opined that Plaintiff's ability to perform work-related physical activities was not impaired. Tr. at 302.

On December 31, 2002, Plaintiff was involuntarily admitted to Jennie Edmundson Hospital and placed on suicide precautions.  Under the heading, Reason For Admission, it is written: "The patient was brought to the ER by the girlfriend with complaints of chest pain, admitted and he had been feeling suicidal with plans to shoot himself.  Had fastened a noose to hang himself but was stopped by his girlfriend and then he wanted to put a shotgun to his head and blow his brains out and she took the gun away."  On admission, a drug screen was positive for methamphetamine and marijuana.  Tr. at 327.  On discharge, Plaintiff was diagnosed by John Fernandez, M.D., on Axis I:  Drug induced mood disorder and polysubstance dependence, intermittent explosive disorder.  Plaintiff was to followup at the Mercy Center for Family Services, for chemical dependency treatment.  Tr. at 328.  When Plaintiff was seen by Dr. Fernandez for a psych history and physical, under the heading Past History, the doctor wrote:

> Reveals the patient was born in Omaha, Nebraska, on 05/30/1971.  He was raised in Council Bluffs.  His upbringing was difficult.  His father beat him a lot and had multiple different kinds of jobs.  His mother was a cook and he thought she was extremely positive and good for him.  He, however, was pulled out of school several times and had a rather chaotic childhood.  His grades were always Bs and Cs and he just barely got through.  Tells me that he has a learning disability, can barely read or write, still does not know how he was passed on.  He feels that he was a nuisance and a trouble maker, got into a lot of fights, and was suspended from school numerous times, but was never take [sic] out of the home.  He finally managed to get his high school diploma.  After that, he worked at several odds and ends but was heavy into drugs and alcohol and keep stealing and breaking and entering, etc.  He got picked up by the law and was put away for about 2-1/2 years.  He spent half the time at Oakdale and the other half at a halfway house in Council Bluffs.  He states he is now reformed and he has been working as a cook and he likes to work at nursing homes, etc., but nobody is hiring at this stage.  He got married at the age of 19.  The marriage lasted just over a year.  He has two children by this lady but he was violent towards her and she

> escaped from him. He claims that she was unfaithful to him. She left him and wants to have nothing to do with him. He has not been seeing the children. He does not have to pay child support as she just prefers him not to be involved with them. He has been having a lot of tumultuous and difficult times. He states he has not been in any legal trouble for the last five years, that he learned his lesson, but his problems still remain. He use to have hobbies. He has none now. He does not care about anything. His girlfriend works as a manager at Arby's and supports him as he has run out of unemployment and has no job. He feels nervous and tense much of the time. Still cannot get over his mother's death.

Tr. at 329-30. On January 2, 2003, Plaintiff underwent a chemical dependency evaluation by DeAnn Zens, MA, ACADC. Tr. at 334-37. During the evaluation, Plaintiff admitted that chemical use interfered with his ability to learn while in school. Under the heading Employment History, it was written: "He describes himself as a very poor employee who would receive poor job performance evaluation from supervisors due to his use and abuse of marijuana and that these episodes of use often caused problems at his place of employment." Plaintiff reported that he was fired after working at the Hardees Restaurant because of marijuana use. "The patient states that he has been terminated from jobs and that chemicals interfered with is employment." Although he reported no income, he said that the spends $50.00 per week on drug use. When asked to describe a typical day, Plaintiff said: "I get up when I want, I watch TV, I smoke as much as I can, I eat, and I go back to bed." Tr. at 335. It was recommended that Plaintiff be admitted for intensive outpatient treatment "due to his motivation for wanting to quit, his insight into his disease, the fact that he has a job waiting [for] him when he leaves the hospital, and the support of friends and family, primarily his girlfriend and his brother that is living with him." Ms. Zens opined that Plaintiff would benefit from treatment coupled with counseling for

depression and suicidal ideations, and a 12-step program. Tr. at 337.

On February 16, 2004, Plaintiff saw Dr. Strider again at the request of his "disability consultant," for an up dated mental status examination. Tr. at 362-70. Plaintiff reported that he was not taking medication. His girlfriend told Dr. Strider that Plaintiff took Paxil and BuSpar for two months and she could see that he had more motivation and was happier. Plaintiff admitted: "I'm lazy now." Plaintiff told Dr. Strider that he had a job putting tires on semis for about six months until January 2004. "He thought he was doing that well until they let him go." Tr. at 362. Plaintiff reported that he lived in a three bedroom trailer with his girlfriend and his brother. In addition they keep four ferrets, five cats, a lizard and two dogs. He was not taking any medication, but agreed that the Paxil and BuSpar helped his mood and behavior. Tr. at 363. Dr. Strider observed that Plaintiff showed some mild decline in range of affect, and "he clearly continues to report significant depressive symptoms." Plaintiff denied delusions, hallucinations or paranoia, and the doctor saw no evidence of psychosis. Plaintiff reported being frustrated about not being able to keep a job. He reported that he had worked Kentucky Fried Chicken for three months but they only gave him two hours of work "here and there." On Axis I, Dr. Strider's diagnoses were Major depression, recurrent, moderate; learning disability, reading, recovvering from alcohol abuse; rule out intermittent explosive disorder. On Axis II, the doctor wrote: Passive dependent personality appears likely. Tr. at 364. Dr. Strider completed several pages of mental residual functional capacity forms (Tr. at 365-70), but noted that Plaintiff's depression was untreated. Tr. at 365.

On May 5, 2005, Plaintiff underwent an evaluation at WESCO Industries, a rehabilitation

facility. On arrival, Plaintiff was able to provide his address, but not his phone number. He was unsure of his age, but was able to recite his birth date. Tr. at 199. Plaintiff reported that he had been in special education since he was five years old. He said that his father had served time in prison for beating him and his siblings. When discussing his work history, Plaintiff said the longest he had worked at any one job was 6-7 months. He said that either he was too slow or could not do the job right. He said that family members or friends had helped him get jobs, but could not help him keep them. He said that his girl friend was the manager at a fast food restaurant, but even so he was only able to work there 6 months before she had to let him go. During the evaluation, Plaintiff was given several time studies based upon Department of Labor rules and regulations. Tr. at 200. Plaintiff was asked to perform tasks such as counting sheets of paper and putting them into stacks of 25 with a rubber band around each stack. On such a task, he performed well below average standards. Tr. at 201. When he was asked to shred two hundred pieces of paper, one at a time, he performed at a production rate of 38%, far below average standards. When asked to perform tasks such as washing off a conference table and vacuuming a floor, etc., he performed at a rate well below average standards. It was noted that during the evaluation, Plaintiff chose to be by himself, rather than associate with his peers to whom he had been introduced. The evaluator opined that Plaintiff did not appear to be under the influence of drugs or alcohol, and that he was cooperative and tried his best at each task. Tr. at 202. In concluding her report, Colleen K. Wessel, Employment Program Specialist, wrote that it would be very difficult for Plaintiff to maintain even an unskilled job do to his low quality and quantity of work and limited social skills. She noted that Plaintiff is highly distractible by any

outside stimuli such as people, sounds, or movements.  Ms. Wessel worte: "It is my opinion, that in the future, Mr. Good would definitely need extra supervision and the assistance of a job coach in order to secure and maintain any type of community employment."  Tr. at 203.

On January 11, 2006, Plaintiff was seen for a psychological evaluation by Russell A. Moulton, M.S.  Tr. at 380-83.  Plaintiff said that his major problem was depression.  He told Mr. Moulton that he stopped taking Paxil after three months because "it made him more depressed."  He also said that he discontinued counseling because he didn't have the money to continue it.  Plaintiff told the psychologist that he continues to experience extreme sadness and crying spells, during which times he isolates himself in a dark room for a couple days at a time.  He said that he often feels overwhelmed and confused.  Tr. at 380.  Mr. Moulton wrote:

> He indicated his most recent job was last November when he got a job as a trash hauler.  Vance went on to say he got the job because the boss was a friend of his girlfriend.  He indicated he didn't like the job because people yelled at him.  He said people told him he wasn't working and then yelled at him.  According to Vance, that made him more nervous as well as afraid.  He said he just stopped going in to work and was fired from that job after about a month.  He said he also had a job at Hy-Vee in Red Oak for about two months.  He said his job was helping in the kitchen and he did cleaning.  Vance indicated he got bored with that job and his girlfriend reported his attendance was poor which resulted in him being fired.

On mental status exam, Plaintiff's mood appeared normal and his affect was appropriate, but he had some difficulty expressing his thoughts.  He had difficulty performing tasks such as digit span and serial sevens.  Plaintiff displayed a limited fund of knowledge, not knowing who the current governor of Iowa is or who the president of the United States was during the Civil War.  Answers to "very basic addition" were incorrect, even though he used his fingers to count.

Mr. Moulton observed that Plaintiff's intellectual functioning was below average.  Tr. at 381.  Plaintiff denied any current alcohol or illegal drug use.  It was Mr. Moulton's impression that Plaintiff had depression as well as some fear and what appeared to be anxiety related to interacting with people.  Tr. at 382.  Mr. Moulton observed that based on Plaintiff's statements, his life "seems to be pretty bleak."  Tr. at 383.

Plaintiff saw Dr. Strider again on May 8, 2007.  Tr. at 407-17.  Plaintiff reported that he was working for a flour company.  Tr. at 407.  Plaintiff told Dr. Strider that he earns $8.75 an hour, works 40 hours a week and has insurance and a 401 plan.  Tr. at 408.  Dr. Strider concluded her report by noting evaluations had "consistently noted the substance abuse difficulties, depression that certainly can be exacerbated by alcohol use, [and] learning disability."  She worte that Plaintiff is not on any anti-depression medication, nor involved in treatment to address anger management or impulsiveness.  Dr. Strider opined that Plaintiff's intellectual ability is in the low average range with a learning disability, and that she did not see evidence of significant memory impairment in spite of Plaintiff's history of chemical abuse.  Dr. Strider wrote that Plaintiff's report of being alcohol and drug free had not been verified by laboratory evidence.  Although Plaintiff had difficulty getting along with others because of his compulsivity and easy temper "he appears to be functioning reasonably with his job now."  Tr. at 410.  At the hearing, Plaintiff testified that he was fired from a job at a company which makes tortilla flour because he was unable to do the paper work correctly.  Tr. at 485-86.

On June 20, 2007, Dee Wright, Ph.D. a psychologist at Disability Determination Services reviewed the medical evidence, including Dr. Strider's May 8, 2007 exam, for the ALJ.  Tr. at

405-06. Dr. Wright pointed out Plaintiff had reported working forty hours a week, moving supplies for a laboratory, and that he was able to do the work because it involved reading only numbers. Dr. Wright wrote:

> The medical evidence of record does support limitations of function with social interaction when this claimant is unduly stressed. Given the claimant's history, he would function best in setting where he were not required to have frequent stressful contact with large numbers of unfamiliar individuals. In a low stress and predictable environment, he has demonstrated that he can sustain short-lived, superficial interaction with others in appropriate ways when it is in his perceived interest to do so.
>
> The current medical evidence of record does not indicate serious limitations of function with self-care or other activities of daily living from a psychological perspective. The claimant indicates no problems with personal grooming. The claimant is able to perform chores in his home environment which involves cleaning and vacuuming. The claimant reported to the examining psychologist that his is able to cook and do laundry. However, his current girlfriend performs these tasks. The claimant reports his girlfriend also does the shopping but that he can do so also if necessary. The claimant is able to travel independently in his environment and he is not currently exhibiting seriously impaired executive functioning.

Dr. Wright opined that Plaintiff did not meet a listed mental impairment, and that he can function as described above. Tr. at 406.

## ALJ'S DECISION

At the second step of the sequential evaluation, the ALJ found Plaintiff has the following severe impairments: borderline intellectual functioning with a learning disability for reading; depressive disorder, NOS, impulse control disorder; intermittent explosive disorder; inadequate, passive and/or dependent personality features and a history of polysubstance abuse in recovery. Tr. at 22. At the fourth step, the ALJ found that Plaintiff's has the residual functional capacity

set out above.  In his decision, the ALJ explained that while Plaintiff testified that many of his jobs ended because he could not perform adequately, the record supports that some jobs ended because Plaintiff simply did not like the work – e.g. the job working on the trash truck and the job as a can sorter.  Tr. at 27.  The ALJ pointed out that although Plaintiff observed improvement in his depression when it was treated with medication and counseling, he discontinued for financial reasons in spite of the availability of low or no cost treatment.  Tr. at 28.  Furthermore, the Court would observe that while Plaintiff stated he could not afford medication, he reported spending as much as $50.00 per week for marijuana.  The ALJ wrote:

> ... The undersigned has been further persuaded that the claimant's poor work history has demonstrated a pattern of quitting as well as poor attendance and boredom related to job tasks leading up to job termination serving to sabotage work attempts which again raises the question of motivation to work; however, the claimant retains the ability to learn simple, routine, repetitive tasks which do not require extended social contact. ...

The ALJ went on to note "the cumulative findings of the consultative examiners which consistently ... recommended treatment for mental health conditions as well as vocational rehabilitation."  The ALJ found that Plaintiff retains the ability to do his past relevant work as a can sorter and stock clerk.  Tr. at 28.

## DISCUSSION

> We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision."  *Reutter ex rel. Reutter v. Barnhart,* 372 F.3d 946, 950 (8th Cir. 2004).

> We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2007)). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at *886*). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.ed 785, 789 (8th Cir. 200*5).*

*Owen v. Astrue,* 551 F.3d 792, 798 (8th Cir. 2008.)  In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 136-37 (8th Cir. 1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

Plaintiff argues, among other things, that the Commissioner failed to properly consider new and material evidence submitted to the Appeals Council on March 13, 2009, a year after the ALJ's decision. Tr. at 440-49. With his letter of argument, Plaintiff submitted a report from Beverly A. Doyle, Ph.D. Tr. at 443. While the Appeals Council acknowledges receiving Plaintiff's letter and Dr. Doyle's report, the report itself does not appear in the record. The Appeals Council wrote that the report was considered, but that it does not relate to the time under consideration by the ALJ, and therefore it is not relevant. Tr. at 8. Plaintiff argues that the Court must determine whether the ALJ's decision is supported by substantial evidence based on the record as a whole, including the report which he maintains is new and material evidence in support of his claim. Clerk's 11 at 7-8. The Commissioner disagrees with Plaintiff and takes the opposite position.

In *Gregg v. Barnhart*, 354 F.3d 710, 712-13 (8th Cir. 2003), ten months after the ALJ's

decision, Greg submitted a mental health evaluation report to the Appeals Council. As in the case at bar, the Appeals Council considered the report but did not include it in the record. Unlike this case, however, Gregg sought and received permission to supplement the record. Nevertheless, neither the District Court, nor the Court of Appeals, found that the report provided a basis for reversal. Here, the Court agrees with the Commissioner that while Dr. Doyle's report may be relevant in a new application for benefits, it is not relevant to the time under consideration by the ALJ, and will not be considered by this Court.

    Plaintiff also argues:

> Clearly, there is uncontroverted evidence which would support, at the very least, a closed period award. From Plaintiff's alleged onset date of January 30, 2002 (his mother's death)(Tr. at 445) through Dr. Moulton's psychological evaluation and report of January 11, 2006 (Tr. at 380) all medical evidence by examining and consulting psychologists reflects serious limitations which could not be accommodated in any competitive work place. Those medical opinions were supported by the May 5, 2005 work evaluation (Tr. 199-203). That evaluation found that despite best efforts, that both the quality and quantity of Plaintiff's job performance was low, that he was slow and highly distractable and that he would need extra supervision or the assistance of a job coach (Tr. at 203). The need for a job coach, of course, could only be accommodated in a sheltered workshop, not a competitive workplace.

Clerk's 11, at 13. At the first step of the sequential evaluation, the ALJ found that after November 19, 2001, Plaintiff engaged in substantial gainful activity. "Within the record, the claimant acknowledge brief stints of employment which ended either due to the inability to perform job duties, poor attendance, low pay, limited hours, substance abuse issues, disliking the work or boredom." It was only by "Giving the claimant the benefit of the doubt ..." and finding that those periods constituted unsuccessful work attempts rather than substantial gainful activity,

that the ALJ proceeded beyond the first step of the sequential gainful activity. Tr. at 22. A review of Plaintiff's earnings record shows that the ALJ did not err in not finding a closed period of disability. Plaintiff has never been a high earner, but his highest year of earning was in 2004 – $8,551.76 – during the time Plaintiff would argue for a closed period. In 2002 Plaintiff earned only $896.01, but in 2003 he earned $3,632.87, in 2004 - $8,551.76 and 2005 - $6,100.90. Tr. at 126. The Court agrees with the ALJ that the record supports that Plaintiff's poor earnings record was due, in addition to being unable to do some jobs, to his poor attendance, the low pay of some jobs, the limited hours of others, using illegal substances, simply not liking some work, and boredom – all non-disability related factors. *See* 20 C.F.R. § 404.1566(c) which states: *"*We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of...*"* Eight reasons are listed, among which are: inability to get work, lack of work in your local area, the hiring practices of employers, no job openings for you, you would not actually be hired to do work you could otherwise do, and you do not wish to do a particular type of work.

The remainder of Plaintiff's arguments can be summarized as the final decision of the Commissioner is not supported by substantial evidence on the record as a whole. Again, the Court disagrees with Plaintiff. There is no question that Plaintiff has mental health impairments. The question, however, is how sever is Plaintiff's condition? In this case, the ALJ determined that while Plaintiff was not motivated to work, his lack of motivation was not caused by a mental impairment. In the first place, Plaintiff habitually used marijuana, sometimes while actually

working. Plaintiff admitted that the effects of marijuana adversely affected his ability work. Although Plaintiff is depressed, it was consistently recommended that Plaintiff receive medication to improve his mood. During the time that Plaintiff actually took anti-depressant medication, both he and his girl friend noted significant improvement in his mood. Plaintiff's claim that he could not afford to continue his treatment is belied by his ability to spend $50 per week on marijuana, a substance which he admitted was adverse to his ability to function in the work place.

In the opinion of this Court, the ALJ's decision is supported by substantial evidence on the record as a whole. In making this determination, the Court has considered the evidence in the record which detracts from the ALJ's findings, but that evidence does not form a basis for a reversal. *See, Gavin v. Heckler*, 811 F.2d 1195 (8th Cir. 1987) discussing in detail the test for determining if the Commissioners decision is supported by substantial evidence on the record as a whole.

## CONCLUSION AND DECISION

It is the holding of this Court that the Commissioner's decision is supported by substantial evidence on the record as a whole and not affected by errors of law which require reversal. The Court has considered the evidence which detracts from the Commissioner's decision as well as that which supports it. The decision to deny Plaintiff the benefits for which he applied is affirmed and the case is dismissed.

    IT IS SO ORDERED.

    Dated this ___6th___ day of April, 2010.

ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT